RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE 12 / 28 / 05
BY DM

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

COLEMAN 80 PINES | CIVIL ACTION NO. 03-1612

VERSUS | JUDGE HICKS

BROOKSHIRE GROCERY COMPANY | MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

This matter came before the Court for a bench trial on Thursday, May 19, 2005. Plaintiff Coleman 80 Pines ("Coleman 80"), a Louisiana partnership, was the lessor of defendant lessee, Brookshire Grocery Company's ("BGC") retail store #67 on Pines Road, in Shreveport, Louisiana. Coleman 80 filed suit to recover damages allegedly caused by BGC's failure to maintain the parking lot according to the terms of the lease agreement. The parties submitted joint stipulations to most of the facts involved in this matter. At trial, three experts in the field of engineering testified. For the following reasons, the Court finds that judgment shall be rendered in favor of Coleman 80 Pines.

## FINDINGS OF FACT

### I. Factual Background[1]

#### *A. Building the Store and Lot*

In 1982, BGC purchased a tract of land in Shreveport for development as a Brookshire retail grocery store in the 80 Pines Shopping Center, known as Parcel I. During the same time frame, Stanaland-Martin Properties purchased adjacent property identified

[1]The Court supplements the joint stipulations with information from the joint exhibits submitted as evidence for this trial.

the same time frame, Stanaland-Martin Properties purchased adjacent property identified as Parcels II and III of the 80 Pines Shopping Center. [Stipulation 1]. BGC hired W. D. Glassell Company, Inc. to design and construct Phase I of the 80 Pines Shopping Center, including the building housing the Brookshire grocery store, a concrete parking lot and service court area in front of and behind the building. [Stipulation 2]. The bid for the original construction of the concrete parking lot and rear service court area of Parcel I, the BGC lot, was $132,740.00. [Stipulation 9].

Following construction of the building and parking lot, BGC sold the land and improvements of Parcel I to Stanaland-Martin Properties, who then leased back the property to BGC pursuant to the lease agreement in a "sale-lease back transaction." [Stipulation 3]. Stanaland-Martin Properties then contracted for the construction of the adjacent building and parking lot (sometimes referred to as "non-Brookshire", "non-BGC" or "retail parking lot") identified as Parcel II and Parcel III on the exhibit attached to the lease agreement. [Stipulation 7; see also, Exhibit 1, Lease Agreement Exhibit A]. Both the BGC parking lot and the non-BGC parking lot were originally constructed of concrete. [Stipulation 8].

***B. The Lease Agreement***

On July 18, 1983, BGC entered into a lease agreement with Stanaland-Martin Properties, a Texas general partnership, for the lease of 31,457 square foot building located at Pines Road and Highway 80 in Shreveport, Caddo Parish, Louisiana. [Stipulation 4]. The lease agreement included the right of use by BGC of the parking lot immediately in front of the BGC store, the drive area long the west side of the building, and the drive area to a rear loading dock. [Stipulation 12]. The primary term of the lease

agreement was twenty years which expired on July 17, 2003. [Stipulation 5]. The lease agreement was drafted by BGC and its lawyers. Stanaland-Martin Properties was represented by counsel in connection with the lease transaction. [Stipulation 6].

Coleman 80 acquired ownership of the leased premises on or about June 8, 1992, and the lease agreement was assigned to it at that time. [Stipulation 10]. Following Coleman 80's purchase of the property, U.L. Coleman Properties was retained to continue management of the property. U.L. Coleman Properties had managed the property since 1989 for the prior owner. [Stipulation 16].

U.L. Coleman Properties, as property manager for Coleman 80, was responsible for maintenance of the adjacent non-BGC parking lot. Pursuant to the retail lease agreements, the tenant/lessees of the non-BGC building were responsible for their percentage share of the maintenance costs. [Stipulation 28].

During the 20 year primary term of the lease agreement and until April 15, 2003, BGC continuously operated a retail grocery store in the leased premises. [Stipulation 13]. During the primary term, customers and employees of BGC used the parking lot. Employees of BGC also utilized the west drive area and rear drive area of the building for the delivery of goods to the store delivered by heavy semi-tractor trailers. [Stipulation 14]. During the primary term, customer vehicle and BGC delivery vehicles traffic was greater on the BGC parking lot than on the non-BGC parking lot. [Stipulation 15]. BGC kept the parking lot for Parcel I striped and generally free of debris. [Stipulation 25].

***C. Previous Repairs***

The first indication of need of repairs found in the evidence appeared soon after construction of the BGC lot. On October 8, 1984, Gary Thiemann of BGC wrote a

memorandum to Jack Bateman of BGC concerning the parking lot. [Exhibit 7]. The brief memorandum in its entirety states:

> Another point came up that I need your help on. The parking lot at #67 is beginning to crack and break up. It's only 15 months old and I don't [sic] what we can do or if you are aware of it. It's going to need help soon.

Id. There is also a handwritten note on the bottom: "Copy to Jack W. – Why would this be happening? JB <signature> Id. Oddly, there is no further evidence concerning this problem. There is nothing to indicate what action, if any, was taken. In fact, there is no further evidence of any repairs or necessary repairs until 1996.

BGC management included a position entitled Facility Maintenance Manager.[2] The responsibilities of the Facility Maintenance Manager included parking lots at BGC retail locations. During the time period of 1996 through 2000, the position was held by Tim Loper. During the time period of early 2000 through July, 2003, the position was held by Johnny Sherrill. [Stipulation 17]. The parties stipulated to the relevant testimony of Loper and Sherrill in lieu of live testimony at trial.

In 1996, a measure of repairs were made to the BGC lot. From the evidence submitted to the Court, it appears these repairs were prompted by a letter dated January 22, 1996, from Daniel Curry of U.L. Coleman to John Broderhausen of BGC. [Exhibit 10]. Curry's letter summarizes repairs needed to the BGC lot and includes some cost estimates. A memo from "Dan" (Curry) to "Linc" (Coleman) dated February 14, 1996,

---

[2]The stipulations and evidence presented to the Court only provides the names of the Facility Maintenance Manager from 1996-2003. There is no evidence as to whether this position was created around 1996 or whether the names of previous managers were simply not provided.

indicates that Curry and Broderhausen met with Tim Loper about the condition of the BGC lot. [Exhibit 11]. The memo also references plans to upgrade the center. Id. A letter dated February 22, 1996, from Curry to Loper confirms plans for renovations of the shopping center. [Exhibit 12].

Loper visited the BGC store and inspected the parking lot for hazardous areas, failures and potholes in February of 1996. [Stipulations 18 & 19]. BGC retained Hanna Construction to make repairs to the parking lot limited to removal and replacement of designated sections of concrete. Loper decided what concrete needed to be torn out and replaced. The total cost of these repairs was $32,776.43. Id.; see also Exhibit 14.

If called, Loper would testify that sealing of cracks in a concrete parking lot was done on an as-needed basis. The purpose of sealing is to stop water infiltration into the subsurface soils. Water in the subsurface causes subsurface erosion of soils as evidenced by pumping of the subsurface soils through cracks in the concrete sections, necessitating sealing. When Loper visited Store 67 in February 1996, he saw evidence of cracking in the concrete but does not recall seeing evidence of sealing being required. [Stipulation 19]. If called, Loper would testify that other maintenance would be performed on an as-needed basis based on store visitations at least once every year and by responding to requests and complaints of store management. [Stipulation 26].

Another effort to make repairs to the lot was initiated in 2002. J.S. Jones of U.L.Coleman sent a letter to BGC on October 3, 2002, enclosing an engineering report prepared by Aillet, Fenner, Jolly & McClelland, Inc. [Exhibit 24] Prepared by a registered professional eningeer, the report estimated costs of repairs to the BGC lot. Option 3 estimated costs for an asphaltic overlay to be $191,556.00. Id.

By letter dated October 29, 2002, Jeremy Slaughter of U.L. Coleman requested BGC to coordinate any "maintenance work" with Coleman 80 in order to "avoid further damage" and to reap a "potential cost savings." [Exhibit 25]. Coleman 80 also wanted to blend the non BGC lot with the BGC lot both "aesthetically as well as structurally." Id. At this point, Coleman requested BGC do no work "without our prior knowledge and consent." Id.

In 2002 (the exact date is not in evidence), Johnny Sherrill of BGC marked certain areas of the parking lot for repairs. The areas to be repaired were delineated by brackets painted with orange paint. The bracketed areas are visible in photographs placed in evidence.[3] No repair work was performed in 2002 or after due to the dispute which arose between the parties as to the scope of the needed repairs. [Stipulation 20].

If called, Sherrill would testify that the criteria he utilized to determine the need for repair to a concrete parking lot was whether the lot was usable to the customer, usable to the store, and safe for customers. [Stipulations 22 & 24]. According to Sherrill, BGC would seal cracks in a concrete parking lot to address two problems: 1) to fill an " . . . older or an excessively large crack" which was a potential trip hazard; and 2) to "assist in keeping the lot secure from water." According to Sherrill, excessive water infiltration can cause base failure of the lot or a pumping of concrete panels. [Stipulation 21]. According to Sherrill, BGC intended to seal the cracks in the entire BGC parking lot at 80 Pines Shopping Center in 2002, for the following reasons:

---

[3]The brackets are visible in the photographs taken by Coleman 80 and dated November 5, 2002 which are submitted as Joint Exhibit 2. The brackets are not visible in the other sets of photographs submitted.

> We wanted to show good faith to U.L. Coleman and make the repairs that were needed. And two, again we had some trip hazards that needed to be taken and needed to be addressed, and there was some sporadic cracking throughout the lot.

[Stipulation 23]. BGC did get at least one estimate for sealing, from Black Stone Paving in November 2002. [Exhibit 26]. Black Stone Paving provided two options: (1) sealing joints and cracks with hot rubber at a cost of $12,241.75 or (2) selective slab replacement at a cost of $70,160.00. Id.

Coleman 80 Pines/U. L. Coleman Properties have no written records of performing any sealing of cracks or joints of the non-BGC parking lot from the time they began managing the property in 1991 until the time the Brookshire lease ended in July 2003. [Stipulation 31]. BGC has no written records of sealing any cracks in the leased parking lot of the store in the 80 Pines Shopping Center during the 20 year primary term of the lease. [Stipulation 32].

***D. Maintenance Work v. Rehabilitation/Capital Improvements***

On or before 1997, BGC was interested in renovating and expanding Store #67. [Exhibits 9,11,12,14 and 17], but in a letter dated July 19, 2001, BGC Vice President of Real Estate Pete Forsyth expressed that BGC was no longer interested in expanding. [Exhibit 15]. This letter appears to be a response to a package sent by U.L. Coleman on July 2, 2001. Id. U.L. Coleman sent another letter on October 16, 2001, congratulating BGC "on the recent announcement regarding your planned renovations in Shreveport-Bossier." [Exhibit 16]. This letter encourages BGC to reconsider plans for Store #67. Id.

By letter dated October 22, 2001, Pete Forsyth gave notice to U.L. Coleman that BGC was not interested in expanding or renovating the store. [Exhibit 17]. Notably, the last line of the letter states: "Thanks for keeping us in mind, but we are going to pass on any

plans to spend money on this store." [Id, emphasis added]. Several letters from U.L. Coleman about renovations for the entire shopping center followed the October, 2001 letter. [Exhibits Nos. 19, 20, & 22]. The only specific problem Coleman addressed with the BGC parking lot is found in a letter dated February 19, 2002 from Heath Rheay to Pete Forsyth. [Exhibit 19]. This letter identifies a drainage problem. Id.

BGC again declined to expand or renovate in a letter dated March, 22, 2002, from Brad Brookshire, President of BGC Corporate Development Group, to Coleman. [Exhibit 21]. A phone log entry dated September 25, 2002, from Coleman's Heath Rheay to BGC's John Broderhausen also indicates that BGC was not renewing its lease. [Exhibit 23]. Furthermore, Coleman's Slaughter had knowledge that BGC may not be renewing the lease before his letter of October 29, 2002 addressed to Sherrill. [Stipulation 33]. Again, by letter dated January 8, 2003, Broderhausen reiterated that BGC was not interested in renovating because BGC was relocating the store. [Exhibit 29].

In 2003, U.L. Coleman Properties started referring to the property as Pines Crossing (as opposed to 80 Pines) in an effort to promote the property and to increase leasing activity. [Stipulation 34]. It was a goal of U.L. Coleman Companies to increase the classification of the 80 Pines Shopping Center from a Class B to a Class A property. [Stipulation 29].

### *E. Termination of the Lease*

BGC moved out of the leased premises on April 15, 2003, before the lease expiration date of July 17, 2003, but paid all rent due under the Lease Agreement through the end of the primary term. [Stipulation 11]. BGC provided written notice of termination to U.L. Coleman by letter dated April 7, 2003. [Exhibit 30]. BGC was not requested by

Coleman to take any remedial action, perform any repairs, or make payment for any repairs as it relates to the building on the premises leased by BGC. [Stipulation 27]. The Court also notes that no further evidence of correspondence between the parties after this written notice of termination was submitted to the Court. On August 25, 2003, Coleman 80 filed suit against BGC for reimbursement of the costs of the "repairs" made to the BGC lot.

### *F. Actual Work Performed and Actual Costs*

Coleman hired Specialty Trackhoe and Dozier Services to do the asphaltic overlay on the BGC and non-BGC lots. Coleman received two bids: one from Specialty Trackhoe for $399,041.00 and one from Grace Construction for $417,906.41. [Exhibit 37]. The actual cost of the overlay was $237,003.51 plus engineering fees of $34,005.00 and general contracting fees of $35,550.00. [Exhibit 38]. The total actual costs for the BGC parking lot was $306,558.00. Id. BGC has not contested the authenticity or admissibility of this evidence.

## II. Expert Witnesses

At trial, the parties presented expert witnesses to assist the Court in defining the language used in the Lease Agreement and assessing the repairs needed pursuant to that language. The parties orally stipulated to the witnesses qualifications as experts prior to the testimony at trial. The Court allowed testimony on the condition of the BGC lot only.[4]

---

[4]BGC moved to admit testimony on the condition of the non-BGC lot in order to compare the conditions of the lots and repairs made to the lots. The Court found that the condition of the non-BGC lot is irrelevant to interpreting the language used in the Lease Agreement because the language of the leases was not similar.

The Court assessed the credibility of the witnesses and their testimony in light of all of the evidence presented in this matter.

***A. Photographs***

The experts testified with the assistance of several sets of photographs introduced as evidence. Two sets of photographs were introduced as joint exhibits: (1) those taken by Coleman 80 on November 5, 2002 [Exhibit 2]; and (2) those taken by BGC before and after April 15, 2003, the date BGC closed the store [Exhibit 3]. In addition, a videotape was introduced by Coleman 80 as Plaintiff's Exhibit 4. The video was filmed by Coleman 80 on September 17, 2003, only two months after the termination of the lease. Plaintiff still-framed the video and created a computer program for use during trial. A still photograph of a specific concrete panel could be viewed by selecting the panel from an aerial photograph of the entire lot. A color aerial photograph of the entire lot was generated from the video and introduced as Plaintiff's Exhibit 1. The Court finds that each set of photographs is helpful in deciding the issues in this matter. The Court is mindful of the fact that the videotape and the photographs generated from it were filmed shortly after the termination of the lease. Nonetheless, the Court finds that the videotape and photographs of September 17, 2003 fairly depict the condition of the lot as of the end of the primary term of the lease.

***B. Mark Snow***

Mark Snow, a registered professional engineer with 19 years of civil engineering experience with the firm of Aillet, Fenner, Jolly & McClelland, Inc., testified on behalf of

Coleman 80. The Court accepted Snow as an expert in the field of civil engineering, noting his experience in parking lot design and rehabilitation.

Snow testified that there are no maintenance-free parking lots. Snow testified that, "[e]ven reinforced, even correctly jointed pavement correctly sized pavement for the thickness, over time the sealant will deteriorate and will need to be resealed over time." Snow testified that the design used to construct the BGC lot, although acceptable, was "low end" even for the 1982 when the lot was constructed. Snow testified that the joint spacing was too far apart and would require heavy or "severe" maintenance.

Snow visually inspected the BGC lot in April of 2002. His firm was hired by Coleman 80 to assess the entire lot (the BGC lot and the non-Brookshire lot) and make recommendations for the repair of the entire lot. Snow opined that the BGC lot was not in a state of good repair at that time. In fact, Snow testified that the lot was in "poor condition." He conceded that the parking lot was still technically usable and "functional," acknowledging that customers' cars were still able to drive and park on the BGC lot.

Snow further testified that "good condition" in his opinion means: (1) few or no surface distresses; (2) several years of life left; and (3) joints and cracks sealed. Snow testified that the BGC lot did not meet these criteria. Snow testified that the BGC lot showed evidence of loss of subgrade material, vertical deformation, and degraded sealant. At trial, Snow opined on the type and extent of damage on selected panels as depicted in the photographs introduced as Plaintiff's Exhibit 1.

Snow also acknowledged evidence of only limited prior maintenance. Several panels had been replaced or partially replaced, although he observed more partial replacements than total replacements. However, there were many cracks that needed to

be sealed. In addition, there was no evidence that the joints had ever been resealed. The original sealant was "deteriorated in place." Snow testified that settlement cracks are normal, but once cracks begin to occur, maintenance neglect becomes an issue. In Snow's opinion, any crack over 1/4" wide needs to be sealed. Snow testified that if the cracks in the BGC lot had been timely and properly sealed, there would have been less loss of subgrade materials and the distress caused by vehicular traffic would have been less severe. Snow admitted that over time the same conditions would have occurred, but with proper sealant, he opined that the lot would have lasted longer.

Snow, through the firm, provided several options and cost estimates to Coleman 80 for possible repairs. In his opinion, 108 panels needed to be replaced. Selective replacements of the slabs on the BGC lot was estimated at $255,000.00. Repairing the base to prevent reflective or mirror cracking and then overlaying the entire BGC in asphalt was estimated at $225,000.00.

The Court found Snow's testimony to be highly credible and very helpful to understanding the causes of specific damage to and deterioration of the BGC lot.

***C. Louis McGee***

Also testifying on behalf of Coleman 80 was Louis McGee of the firm Demopulos & Ferguson Associates, Inc . McGee is a registered professional civil engineer with 49 years of experience. McGee was retained by Coleman 80 in February, 2003 to make an engineering survey evaluation of the pavement on the BGC parking lot. The actual evaluation and report was done in April after BGC moved out of the premises but before the termination of the lease. At the time McGee made the evaluation, he had not read Snow's report. McGee did have the original design plans for the parking lot.

McGee agreed with Snow that the design of the lot was at the low end, even for 1982. McGee explained that the 20' X 20' concrete panels comprising the BGC lot were too large. He stated that the panels should have been designed no larger than 12' X 6'.

McGee also testified that the subgrade soil was highly plastic (i.e., subject to cycles of shrinking and swelling based on moisture content), which is a "bad subgrade" and likely to cause more cracking.[5] McGee admitted that maintenance would not have prevented cracking from occurring on the lot. He also stated that the lot was usable and relatively stable at the time of his evaluation. However, he also testified that it "needed definite repairs."

McGee testified that when a crack reaches a point where the aggregate bond is breached, the crack needs to be sealed. He also testified that "quartering" is a sign of need of repair. McGee recommended a visual inspection once a year to determine which cracks needed sealing. McGee also opined that sealing was more important when dealing with surface drainage to prevent water from getting into cracks.

McGee defined a retail concrete parking lot in "good repair" as follows: "one that is safe, safety being a primary concern, that is, with not having large cracks that you could have a tripping effect from. Even with minimal cracking." When questioned, McGee answered that he would not consider a lot in good repair if it had distresses, cracking, edge faulting, and spalling.

McGee also testified that in his opinion the BGC lot was not in "good repair." In McGee's opinion 183 of the 200 panels were damaged. Of these, he thought that 96 of

---

[5]McGee did not test the soil or subgrade under the lot himself, but based his evaluation on U.S. Soil Conservation Service maps of the area.

the concrete panels needed to be replaced. He also opined that some of the panels were so deteriorated that no repair was possible; total panel replacement was needed. McGee also testified that the only evidence of maintenance on the BGC lot was replacement or partial replacement of some of the slabs. McGee testified that there was no evidence of routine sealing of cracks.

Although Coleman 80 did not ask McGee to estimate costs of repair, he did suggest options and estimate costs in his report. McGee estimated that selective replacement would cost about $228,000.00 (without engineering and contracting fees). McGee estimated an asphaltic overlay with a fabric underlayment at $80,000.00 (without engineering and contracting fees). This estimate did not include any slab replacement and was "about the cheapest thing that could be done" and "wouldn't have lasted a whole long time." McGee testified that the asphaltic overlay would extend the lot's useful life only for about 3-5 years. He also testified that in his opinion the lot was nearing the end of its useful life. McGee also noted that the original plans for the BGC lot did not mention a life expectancy. McGee's evaluation recommended asphaltic overlay.

The Court also found McGee's testimony to be highly credible and very helpful to understanding the causes of specific damage to and deterioration of the BGC lot.

***D. Ronald Reed***

Ronald Reed of Reed Engineering Group, testified on behalf of BGC. Reed is a registered professional civil engineer with a speciality in geotechnical engineering. Reed specializes in evaluating soil and soil conditions. Reed also designs pavement thickness in relation to the subgrade. Reed was contacted by BGC in June of 2003 to evaluate the lot and assess any failures. He was provided Snow's report at that time. Reed tested core samples from the soil to determine the condition of the subgrade.

He testified that the lot was not constructed according to the original design specifications. Specifically, he testified that the concrete was not as thick as the original plans required and the sand base specified in the plans was not present. However, Reed testified that this was a positive oversight because sand over clay holds water and would have increased the pumping effect on the lot.

In Reed's opinion, the lot was "generally good from the standpoint of usability." He also testified that the problems the lot had were cosmetic, not structural. Reed further opined that the lot was in "good structural repair" considering the 20 year life span of the lot. Reed opined that the lot was at the end of its useful life.

Reed testified that with a concrete lot, problems should be addressed as they occur. Reed opined that BGC had "sufficiently maintained" the lot. Reed testified that there were failures in the lot, but that it was still functional. In his opinion, the lot was in "good repair." Even if repairs were required, Reed testified that short term repairs could have been done that would have been less expensive than the repairs made by Coleman 80. Reed testified that asphaltic overlay is "enhancement" and/or "rehabilitation", not just "repair." In his opinion "good repair" means "usable and you can drive across it." Reed testified that "cosmetics or aesthetics" should not be considered in defining "good repair." Reed testified that one does not need to prolong the life of a parking lot in order to keep it in good repair. Reed also stated that an advantage of overlay rather than selective replacement is to prolong the life of the surrounding section.

Reed also testified that many of the cracks that Snow and McGee referred to were not cracks that needed sealing. Reed testified that many of the shrinkage cracks 1/4" wide

at the surface were not deep enough to require sealing. Reed further testified that no maintenance could have been done to prevent the cracks from occurring. He also testified that sealing is typically recommended with an expansive or erosive subgrade. Reed also testified that minor pumping was occurring on the BGC lot, but that sealing would not have stopped the pumping, rather the pumping would have pushed out the seal. Reed also testified that in his opinion regular sealing would not have extended the life of the lot. Reed testified that most of the problems with the lot resulted from heavy traffic on pavement that was too thin.

Reed disagreed with Snow and McGee as to the depth of the wider cracks. Reed argued that there testimony was not physically possible. Reed testified that if all of the shrinkage cracks allegedly 1/4" wide were in fact 1/4" wide much below the surface, then the parking lot would have moved west by 12 inches. Reed testified that the lot has not moved, therefore the cracks cannot be that wide below the upper surface of the concrete. Reed also testified that he did observe some structural failure cracks which he believes were a result of the lot nearing the end of its useful life.

Reed testified that "necessary repairs" in his opinion are those needed only because of structural failure or distress. Reed also testified that failure to address shrinkage cracks would not lead to structural failure. Reed also stated, "I don't think the actual lack of sealing has had any material effect on the longevity of it [the lot]." Reed also testified that the structural failures he observed were from "wear and tear" and admitted that he did not see any signs of repair or maintenance other than the panel replacements also observed

by Snow and McGee. Reed testified that if the lot had been constructed as designed, there would not be as much structural failure.

Under cross-examination, Coleman 80 elicited testimony about why BGC made repairs to the lot in 1996.[6] Reed was not retained by BGC or any other company regarding repairs in 1996, therefore, the Court finds that any testimony by Reed about BGC's repairs in 1996 is merely speculative and of no help to the Court in deciding this matter. The Court disregards that portion of Reed's testimony.

Reed estimated a cost of about $10,000.00 to fix the structural failures he observed on the BGC lot at the time of his evaluation. He estimated not per square foot but per panel as Snow and McGee estimated. Reed testified that he estimated "a rough crude number and then I called the contractor and got a rough idea a square." Reed could not explain how he arrived at his calculations exactly. In fact, he testified that he was told to "SWAG it." The Court noted that "SWAG" is an acronym for "sensible wild ass guess." Reed claimed he was not familiar with that meaning.

The Court found Reed's testimony to be substantially less credible than Snow's and McGee's and only marginally helpful to understanding the causes of the specific damage to the BGC lot in this instance. His estimate of repair costs are not predicated on the methodology used by other engineering experts in the field to arrive at such an opinion. The Court, therefore, elects not to utilize his opinion.

---

[6]Counsel for Coleman 80 ultimately asked: "So is it your testimony that by making the repairs they were trying to return the parking lot to good repair?" and Reed answered "Yeah."

### *E. Snow's Rebuttal*

On rebuttal, Coleman 80 recalled Mark Snow to testify about the costs of asphaltic overlay per square yard. Snow estimates that the cost per square yard could be as low as $8.00 or as high as $20.00 depending on the type of work needed. Snow estimated that sawcutting to replace partial panels, as Reed recommended, costs about $20.00 per square yard. Snow testified that it costs about $12.40 per square yard just to remove the pavement. Snow estimated removal and replacement to be between $55.00-65.00 per square yard.

### *F. The BGC Parking Lot*

The Court finds that the BGC parking lot was not in "good repair" or good condition at the end of the lease period. All of the experts agreed that many of the cracks were normal shrinkage cracks that occur in all concrete; however, the experts disagreed as to the extent of the damage caused by these cracks and which cracks needed to be repaired. The Court declines to make a specific finding involving a panel by panel analysis of which cracks needed to be repaired. Snow estimated that 108 panels (56%) needed replacment. McGee estimated that 96 panels (48%) needed replacing. Reed's testimony does not provide a useful figure for the Court to consider. The Court accepts the testimony of Coleman 80's experts and finds that 56% of the panels were so damaged that replacement was recommended.

## CONCLUSIONS OF LAW

### I. Louisiana Lease Law

Pursuant to the Louisiana Civil Code, "[d]uring the lease, the lessor is bound to make all necessary repairs to maintain the leased property in a condition suitable for the purpose for which it was leased, except for those repairs for which the lessee is responsible." La. Civ. Code art. 2691. "The lessee is bound to repair damage to the thing caused by his fault or that of persons who, with his consent, are on the premises or use the thing, and to repair any deterioration resulting from his or their use to the extent it exceeds the normal or agreed use of the thing." La. Civ. Code art 2692. However, comment (d) to Article 2692 expressly recognizes the parties' "freedom . . . to agree to a different division of responsibility for repairs."

The parties do not dispute the validity of the lease agreement. The Lease Agreement requires maintenance of the parking lot connected to the BGC retail store. Section IV of Lease Agreement states, in pertinent part:

> A. Primary Term. . . . Lessee shall keep in **good repair** . . . the parking lot, . . . Lessee agrees during such term to conduct a **sufficient program of maintenance** and make all **necessary *repairs*** to the same because of **wear and tear** created by virtue of the use and occupancy of the premises by the Lessee, . . . .

[emphasis added]. The parties dispute the interpretation of this section including the meanings of various highlighted words within the section. The Court finds that BGC and Coleman 80 expressly agreed to a different division of repairs than found in Louisiana law. The lease agreement places the burden of "wear and tear created by virtue of the use and occupancy" squarely on the lessee, BGC, in direct contravention to Article 2692. Coleman 80 argues that the section obligates BGC not only to sufficiently maintain the parking lot

but also to repair normal wear and tear. [Plaintiff's Conclusions of Law, ¶ 15]. However, the parties still dispute meanings of the lease language. Because of this unresolved dispute, the Court must look to Louisiana rules governing contractual interpretation.

## II.    Louisiana Contract Law Interpretation

The Louisiana Civil Code defines a lease as a synallagmatic contract. La. Civ. Code art. 2668. Interpretation of contracts "is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. The Louisiana Civil Code provides specific guidance in determining the meanings of words in contracts. "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ. Code art. 2047. "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code art. 2048.

"A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code art. 2049. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code art. 2053. "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text." La. Civ. Code art. 2056.

The parties stipulated that BGC is the party that furnished the text of the lease contract in dispute. [Stipulation 6.] Therefore, any doubt in the language must be

interpreted against BGC.[7] However, this does not mean that Coleman 80 can elect to define "good repair" anyway it chooses. In interpreting a lease contract, the court may consider all pertinent facts, including the interpretation given the contract by the parties themselves. KPW Associates v. S. S. Kresge Company, 535 So.2d 1173 (La.App. 2nd Cir. 1988).

The Court finds that the words of Section IV of the lease agreement are susceptible to different meanings. Therefore, the Court will examine the words "in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, . . ." La. Civ. Code art. 2053.

## III. Words of the Lease Agreement, Section IV

The Court has already held that the lease places the burden of repairs for wear and tear on BGC. The Court must now determine the definitions of "good repair," "sufficient program of maintenance," and "necessary repairs."

Coleman 80 contends that "necessary repairs" are those needed to repair damage caused by "wear and tear." [Plaintiff's Conclusions of Law, ¶ 18]. Furthermore, Plaintiff contends that "good repair" is a "much broader and significant standard" than merely "functional."

Coleman 80 contends that BGC did not properly maintain the parking lot over the 20-year lease and that the lack of a sufficient maintenance program exacerbated the degradation from normal wear and tear. Coleman 80 further alleges that the repairs made

[7]The Court also notes the general rule that a lessee's repair obligations are properly construed more broadly under a long-term lease such as the one at issue here. See, e.g., Fisher Properties v. Arden-Mayfair, Inc., 106 Wash.2d 826, 726 P.2d 8 (1986). See also 1 Friedman on Leases (3d ed. 1990), Repairs, § 10.601, pp. 655-656 ("Where the term is longer and the tenant has time to amortize the cost, a repair clause is more apt to be construed liberally.")

after the termination of the lease were the most economical and practical repairs. Therefore, Coleman 80 contends that BGC should bear the full cost of the repairs and improvements made to the parking lot.

BGC attempts to defines "good repair" as usable and functional. BGC contends that it did sufficiently maintain and make necessary repairs as required by the Lease Agreement. BGC further contends that the "repairs" made by Coleman 80 after the lease termination were more than necessary to fix any alleged problems. BGC asserts that it should not have to pay for a total renovation of the parking lot for future marketing of the shopping center.

Both parties cite Louisiana appellate cases that interpret lease provisions requiring "return to original condition."[8] The Court finds that the Lease Agreement does not require the parking lot to be returned to it's "original condition" or "same condition." The Court finds that the cases cited are irrelevant to this dispute.

***A. "Good repair."***

The Court finds that "good repair" is not defined anywhere in the Lease Agreement or Louisiana law. The parties have not introduced any written document that specifically defines the parties mutual intent of "good repair." The parties did introduce expert testimony to assist the Court in determining the definition of "good repair." See supra, Part II.

---

[8]See Ghisalberti v. LaGarde, 146 So. 763 (La. App. Orleans 1933); Gravolet v. Fair Grounds Construction, 878 So.2d 900 (La. App. 4 Cir. 7/14/04).

Prior interpretation of the lease agreement is also helpful in determining the meaning. La. Civ. Code art. 2053. The only evidence of past interpretation or mutual intent is the past repair made by BGC and written requests for repairs by Coleman 80 to BGC. Both parties note the lack of evidence of other repairs in support of their positions. BGC claims they were not asked to make other repairs. Coleman 80 claims that BGC was not sufficiently maintaining the parking lot or there would have been more repairs and/or documentation of repairs. The parties have introduced evidence of past repairs that is helpful to determining mutual intent.

In 1996, Coleman 80, the lessor, initiated repairs to the BGC parking lot. BGC ultimately paid for selective panel replacement on the lot. [Stipulation 18]. However, it is unclear if the joints were cleaned and sealed as requested by Coleman 80 in a letter dated January 22, 1996. [Exhibit 10].

As evidence of lack of mutual intent, the Court considers the failed attempt to have repairs performed on the BGC lot in 2002. BGC alleges that it was prepared to make some repairs to the lot in 2002. Bids for sealing cracks and reconstruction of broken areas with asphalt were obtained from Black Stone Paving on November 11, 2002. [Exhibit 26]. BGC alleges that no work was done because Coleman 80 asked BGC not to make the repairs. However, the evidence presented to the Court does not support this contention.

There is one letter in evidence indicating that Coleman 80 requested prior consent before repairs were made. [Exhibit 25]. This letter was sent before the estimate from Black Stone Paving was received. However, this is the last piece of evidence presented concerning repairs in 2002. There is no evidence that BGC presented either of the Black

Stone Paving options to Coleman 80 and there is no evidence that Coleman 80 rejected either of these options or any others.

The Court has considered the experts varying definitions of "good repair" and the evidence of past interpretation or mutual intent. The Court finds that "good repair" as intended by the lease agreement is "normal use with sufficient program of maintenance and making necessary repairs." However, this is a definition that needs further clarification.

***B. Normal Use***

The parties stipulated that BGC's customers and employees used the lot. There is no evidence or allegations that BGC improperly used the lot. However, there is evidence that the western drive area of the lot used by the heavy semi-tractor trailers to deliver products to BGC sustained more damage than the rest of the lot. As routine deliveries by semi-tractor trailers were made to BGC, this damage is part of normal wear and tear expected of this lot.

BGC attempts to benefit from a defective design or construction defect argument. The Court notes that BGC designed and contracted the building of the lot prior to the sale and lease-back. Furthermore, BGC employees had knowledge of problems within months of construction. Any claim for defect of design or construction available to BGC at that time has long since passed. BGC cannot hide behind its argument of defective design or construction. Furthermore, there is no evidence that Coleman 80 knew of the early problems with the parking lot. If BGC intended for plaintiff to be liable for those damages, then BGC should have notified plaintiff in 1984, not 2002, much less 2005.

The Court finds that the damage to the BGC parking lot was a result of normal wear and tear from normal use as intended for this parking lot.

### *C. "Sufficient Program of Maintenance"*

The parties did not have an agreed upon program of maintenance for the BGC parking lot. Neither Coleman 80 nor BGC have introduced evidence of a written program of maintenance for the lot. BGC alleges that the lot was inspected by employees on a regular basis. [Stipulation 26]. Loper and Sherrill, the BGC Facility Maintenance Managers from 1996-2003, claim to have made visual inspections once a year. However, there are no inspection reports prepared by BGC employees proving that the periodic inspection actually occurred.

The Court finds that BGC did little maintenance on the lot over the twenty year primary term. The parties stipulate that BGC kept the lot striped and generally free of debris but, the experts all agree that the only evidence of maintenance was the selective replacement of slabs performed in 1996. [Stipulation 25]. No evidence of sealing joints or cracks was found by any of the experts. There are no other records that indicate other maintenance or even inspection was ever done.

The experts have differing opinions as to whether sealing the joints and/or cracks would have decreased the cracks and/or structural failures. The Court finds that sealing every crack would not have halted all future cracks. However, the Court accepts the expert testimony of Snow and McGee that regular sealing of joints and larger cracks is necessary to maintain a lot in good repair. The Court finds that over a 20 year period, some periodic sealing of joints and cracks should have been performed under a program of "sufficient maintenance." BGC breached its lease agreement with Coleman 80 by not having in place a program of sufficient maintenance.

*D. Necessary Repairs*

The Court must now determine which repairs are "necessary because of wear and tear" in light of the above findings. The Court has found that BGC did not comply with a sufficient program of maintenance. Damage to the lot was a result of normal use, and BGC should have repaired the damage on an as-needed basis or as part of a regular schedule of maintenance. At a bare minimum, BGC should have repaired the openly obvious problems at the termination of the lease.

Some of the damage on the BGC lot met the definition of a necessary repair. However, the Court does not find that the entire lot was in need of necessary repair. All the experts agreed that some panels sustained more damage than others. The Court has already found that 56% of the panels were so damaged that selective replacement was recommended. The Court accepts the opinion of Snow and will define "necessary repairs" as those which would require selective slab replacement in order to restore the slab to "good repair."

***E. Conclusion***

In summary, the Court finds that "good repair" as intended in the lease agreement means "normal use with sufficient program of maintenance and making necessary repairs." The Court finds that the damage was caused by normal use and that BGC did not comply with the sufficient program of maintenance requirement of the lease. The Court further finds that "necessary repairs" is restoration of the panels that Snow recommended for selective replacement, or 56% of the panels. The Court concludes that BGC has not kept the lot in "good repair" as required by the Lease Agreement.

## IV. DAMAGES

### *A. Costs of Necessary Repairs*

BGC violated its duty under the Lease Agreement to keep the lot in "good repair." The Court has further defined "necessary repairs" as those restoring the panels selected for replacement to "good repair." Therefore, the Court must now consider what monetary damages are owed to Coleman 80.

BGC argues that damages should be "the reasonable cost of putting the parking lot into the required state of repair or condition as contemplated by the covenant." [BGC Post-trial Brief, Doc. No. 41, p. 1]. Coleman 80 argues that damages should be the loss sustained by plaintiff, which is the "total costs actually incurred in the rehabilitating of the BGC parking lot." [Coleman 80 Post-trial Brief, Doc. No. 40, ¶ 10]. Coleman 80 further contends that it mitigated damages by electing asphaltic overlay rather than slab replacement. Coleman 80 also provided evidence of mitigation by soliciting several bids for the project and choosing the lowest bidder to perform the rehabilitation of the lot.

BGC further argues that damages should not be the actual costs or even a percentage of the actual costs. BGC asks the Court to calculate damages based on the estimated cost of asphaltic overlay provided by McGee ($80,000.00). BGC then asks the Court to reduce this amount based on the percentage of panels that McGee estimated to be in good repair (58%, according to BGC). BGC then asks the Court to divide this number by two (2), sharing half (½) the cost with the lessor because of vices and defects in the property. BGC's total damages for rehabilitating the parking lot would then be $46,400.00.

The Court will first clarify several points. First, the Court has already held that the

vice and defect of design or construction defense is not proper. Therefore, the Court will not divide the final damages amount between the parties.

Second, McGee did not testify that 58% of the panels were in "good repair." He found that 183/200 panels were damaged. He further found that 96 of those panels were so damaged as requiring replacement. Therefore, a better way to summarize his opinion is to state that at least 48% of the panels were <u>not</u> in "good repair."

Third, the Court finds that McGee's, as well as Reed's, estimated costs are not comparable to Snow's. McGee was not asked to estimate costs and admitted at trial that he did not consider all of the costs that Snow accounted for in the estimates. The Court finds that McGee's estimate, although credible, is not comparable to Snow's in the level of detail used in estimating costs. The Court also finds that Reed's cost estimates may not be used as comparable. Reed's cost estimates were admittedly unsubstantiated guesses unworthy as an expert opinion. As BGC did not present any further evidence on costs, the Court accepts Snow's estimate of $324,664 for the asphaltic overlay. The actual cost of the BGC lot rehabilitation was $306,558.00, including construction costs and engineering fees. Therefore, the actual cost, although close, is actually lower than Snow's estimate.

Because the actual cost of the repairs are lower than Snow's estimate, the Court will base the damages amount on the actual costs. However, the Court finds that BGC is not responsible for the entire overlay of the BGC parking lot. As noted above, BGC did breach it's duty of Section IV as written in the Lease Agreement. However, the Court finds that a complete overlay was not <u>necessary</u> to keep the lot in "good repair." The Court will use Snow's estimate that 56% of the lot was in need of replacement. Therefore, the Court

finds that BGC shall be responsible for 56% of the costs, resulting in damages in the amount of $171,112.48.

### *B. Legal Interest*

Because this action was brought pursuant to the Court's diversity jurisdiction, Louisiana state law governs the issue of prejudgment interest. Under Louisiana law, prejudgment interest begins to accrue from the date of judicial demand, regardless of whether the damages are unliquidated, disputed, or not ascertainable until judgment. FDIC v. Fidelity & Deposit Co., 827 F. Supp. 385 (M.D. La. 1993), affirmed, FDIC v. Fidelity & Deposit Co., 45 F.3d 969 (5th Cir. 1995). Louisiana law does provide circumstances by which prejudgment interest may begin before the date of judicial demand. Cotton Brothers v. Industrial Risk Insurers, 941 F.2d 380 (5th Cir. 1991), quoting Mini Togs Products, Inc. v. Wallace, 513 So.2d 867 (La. App. 2nd 1987).

The Louisiana Supreme Court clearly explains when prejudgment interest may be awarded:

> [D]amages for breach of contract are due from the moment of an active violation of a contract and from the time that a debtor is placed in default if the breach is passive. An obligee, therefore is entitled to interest from date of default rather than from the date of judgment or from date of judicial demand.

Thomas B. Cathings & Assocs. v. City of Baton Rouge, 621 So. 2d 767 (La. 1993)(emphasis added)(*citing* Alexander vs. Burroughs Corp., 359 So. 2d 607 (La. 1978).

Coleman 80 argues that BGC breached the Agreement at least as early as 1997, therefore interest should run from January 1, 1997. BGC contends that interest should run

from the date of judicial demand because Coleman 80 did not put BGC in default. BGC relies heavily on Trans-Global Alloy Limited v. First National Bank of Jefferson, 583 So.2d 443 (La. 1991), for this contention. The Court notes that Trans-Global was written before the Cathings decision quoted above. Furthermore, the Trans-Global decision is distinguishable because the court found that prejudgment interest was not appropriate due to the complicated nature of the case. The Trans-Global court could not find from the evidence whether there was active or passive breach.

In this case, the Court finds there was an active breach of the Lease Agreement by BGC from the date the lease expired. BGC had no intention of complying with Section IV of the Lease Agreement. However, BGC could have complied and made necessary repairs as late as the last day of the lease. Therefore, the Court finds that interest should accrue from the day after the last day of the lease or July 18, 2003.

**CONCLUSION**

The Court finds that under the lease BGC was responsible for keeping the parking lot in "good repair" which is a deviation from Louisiana lease law. The Court finds that "good repair" as intended in the lease agreement means "normal use with sufficient program of maintenance and making necessary repairs." The Court further finds that BGC breached this obligation. However, the Court does not find that BGC owes Coleman 80 Pines a new parking lot. The Court finds that BGC is liable for 56% of the actual cost of the asphaltic overlay on the BGC parking lot, including engineering fees and contracting fees, for a total damages in the amount of $171,112.48. The Court further finds that legal interest on that amount is owed from July 18, 2003, the day after the lease expired.

Therefore:

**IT IS ORDERED** that judgment in favor of the plaintiff Coleman 80 Pines shall be awarded in the amount of $171,112.48, plus interest at the legal rate per annum from July 18, 2003 until paid.

Shreveport, Louisiana, this 28th day of December, 2005.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE